IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER STULL, | ) |
|     Plaintiff, | )    C.A. No. 22-92 Erie |
| | ) |
| v. | )    District Judge Susan Paradise Baxter |
| | ) |
| UPMC HAMOT, et al., | ) |
|     Defendants. | ) |

**MEMORANDUM OPINION**

### I.    INTRODUCTION

#### A.    Relevant Procedural History

Plaintiff Jennifer Stull initiated the present action on February 8, 2022, by filing a complaint in the Court of Common Pleas of Erie County, Pennsylvania [ECF No. 1-1], against Defendants UPMC Hamot, UPMC Health Systems, Magee Women's Hospital, and University of Pittsburgh Physicians Department of Obstetrics, Gynecology and Women's Health. The action was subsequently removed to this Court pursuant to a Notice of Removal filed by Defendants on March 15, 2022 [ECF No. 1].

The complaint contains four counts: Count I claims that Defendants breached Plaintiff's employment contract by their actions leading up to and including the termination of her employment contract on May 10, 2019; Count II claims that Defendants misappropriated Plaintiff's name and likeness by misinforming her patients of her employment status and continuing to use her image and name after her employment was terminated; Count III claims that Defendants tortiously interfered with contractual relationships between Plaintiff and her patients; and Count IV claims that Defendants made misrepresentations to Plaintiff during

1

negotiations of the terms of her employment agreement. Defendants filed an answer to the complaint on April 7, 2022, and discovery ensued.

After the parties completed discovery, Defendants filed a motion for summary judgment [ECF No. 30], along with an appendix of exhibits, a concise statement of material facts and a supporting memorandum [ECF Nos. 31-33, respectively]. In response, Plaintiff filed a memorandum in opposition [ECF No. 39][1] and a responsive concise statement of material facts [ECF No. 50].[2] Defendants have since filed a reply to Plaintiff's opposition memorandum [ECF No. 43] and an appendix and reply to Plaintiff's responsive concise statement of material facts [ECF Nos. 51 and 52, respectively]. This matter is now ripe for consideration.

**B.      Relevant Factual History[3]**

UPMC Health Systems ("UPMC") consists of two arms – the for-profit arm that operates the hospitals and the non-profit arm that employs physicians and operates the community medicine clinics. (ECF No. 52, at ¶ 1). UPMC Women's Health is a division of University of Pittsburgh Physicians ("UPP"), which falls under the non-profit arm of UPMC. (Id. at ¶ 2). In 2015 and 2016, high-level discussions took place between UPMC and UPMC Women's Health regarding an intent to open an obstetrics and gynecological specialty practice affiliated with UPMC Magee Women's Hospital in Erie, Pennsylvania ("Erie Magee"). (Id. at ¶ 3). It was

---

[1] Inexplicably, Plaintiff actually filed two memoranda: the first consisting of 47 pages [ECF No. 38] and the second containing 50 pages [ECF No. 39]. The memoranda are virtually identical; however, given its slightly longer length, the Court accepts the second memorandum as Plaintiff's submission and will disregard the first.

[2] Although Plaintiff failed to file her response to Defendants' concise statement of material facts with her opposition memorandum, the Court granted Plaintiff leave to file her response out of time [ECF No. 46] and subsequently granted Defendants the right to file a reply to Plaintiff's response [ECF No. 49].

[3] The factual history set forth herein has been gleaned from the parties' concise statements of material facts [ECF No. 32, 50, 52], but only to the extent such facts are undisputed and/or amply supported by the evidence of record.

intended that Erie Magee would compete with OB/GYN Associates, the only other high-volume obstetrics and gynecological specialty practice in Erie at the time. (Id. at ¶ 4).

Dr. Bart Matson ("Matson") was recruited to lead the new Erie Magee, which opened in the Fall of 2016. (Id. at ¶ 5). In addition, UPMC sought to recruit three physicians at OB/GYN Associates to join the Erie Magee practice, including Plaintiff. (Id. at ¶ 6). In or around November 2016, a "kickoff" meeting was held at a restaurant south of Erie at which Plaintiff and the other two physicians from OB/GYN Associates, Drs. Weibel and Abraham, negotiated terms of a transfer from OB/GYN Associates to Erie Magee, where they would join Drs. Robert Edwards ("Edwards"), David Gibbons ("Gibbons"), and David Badway ("Badway"). (Id. at ¶ 7). During that meeting, Plaintiff, along with Drs. Weibel and Abraham, expressed that their motivation in moving from OB/GYN Associates was to better provide for patient care. (Id. at ¶ 8).

On February 15, 2017, Plaintiff executed a term letter accepting an offer of employment from UPP, and on March 1, 2017, Plaintiff and UPP executed a physician employment agreement ("Employment Agreement"). (Id. at ¶¶ 12-13; ECF Nos. 31-6 and 31-7). Exhibit A to the Employment Agreement specifies that "[Plaintiff] will devote [her] full time effort to providing obstetrical and gynecologic medical services" for Erie Magee. (Id. at ¶ 14; ECF No. 31-7, at p. 12, ¶ II). The Employment Agreement contains an integration clause stating that the agreement "contains all agreements between UPP and [Plaintiff]... Nothing which UPP said to the [Plaintiff] orally, or the [Plaintiff] has said orally to UPP changes the terms of this Agreement." (Id. at ¶¶ 15, 18; ECF No. 31-7, at p. 11, ¶ 12.8). The Employment Agreement also contains a paragraph concerning Plaintiff's "Relationship to Patients and Records," which states:

> All patients for whom [Plaintiff] provides medical care are the patients of UPP with respect to all other matters. All patients seen by [Plaintiff]

3

> during her employment with UPP and all patients seen by other employees of UPP are the patients of UPP in the same manner. All patient records shall at all times belong to and remain in the custody and control of UPP in UPP's or a hospital's premises unless reasonably required for patient care or specifically authorized in writing to be removed from said premises by UPP's President.

(Id. at ¶ 16; ECF No. 31-7, at p. 5, ¶ 6.0). In addition, the Employment Agreement includes a "Post-Termination Covenant," which states, in pertinent part:

> For a period of one (1) year immediately following termination of the Agreement… [Plaintiff], either on his/her own account or on behalf of another whether in the capacity as an employee, partner, owner or in any other capacity whatsoever, will not perform or provide professional obstetrics or gynecology services on an inpatient or outpatient basis within Erie County and a radius of ten (10) miles from any principal location from which [Plaintiff] provides surgical services during the term of this Agreement…

(Id. at ¶ 19; ECF No. 31-7, at p. 8, ¶ 8.8.1).

Plaintiff began to work at UPMC on May 1, 2017, and between then and December 2017, provided full-time OB/GYN services to patients through UPMC, for which she was paid in accordance with the Employment Agreement. (Id. at ¶¶ 22-24). In November 2017, Plaintiff had a wrist arthroscopy to address increasing pain in her right wrist, after which she returned to work immediately (Id. at ¶¶ 25-26). However, several weeks later, Plaintiff reinjured her wrist in a motor vehicle incident and was told she needed further surgery. (Id. at ¶ 27-28). Plaintiff notified UPMC that she would need to take leave to recover from the impending surgery. (Id. at ¶ 29).

On January 29, 2018, Plaintiff underwent an ulnar shortening and proximal row carpectomy surgery on her right wrist. (Id. at ¶ 31). Consistent with her prior notice, Plaintiff was placed on FMLA leave as of the date of her surgery, as she expected to be unable to work for a period of two months. (Id. at ¶ 32).

On or about March 22, 2018, Plaintiff attended a meeting related to the Erie Magee practice. (Id. at ¶ 33). While speaking with Matson and some other doctors, Plaintiff took off her splint and demonstrated that she was not able to move her wrist yet. (Id. at ¶ 34). On March 27, 2018, Plaintiff's physician, Dr. Hood, completed a note indicating that Plaintiff was "ok to return to work (office only) starting 4-2-18." (Id. at ¶ 35; ECF No. 31-9).

On April 6, 2018, UPMC received a "release to return the work form" from Dr. Hood, dated April 5, 2018, which indicated that Plaintiff was cleared to return to "office work only," and showed that she had limited ability to perform repetitive fine manipulation and grasping with her right wrist, which are integral skills for an OB/GYN physician. (Id. at ¶¶ 37-38; ECF No. 31-10).

On or about July 13, 2018, Plaintiff submitted a claim for long term disability, which including the following statement in response to the question, "What specific duties of your occupation are you unable to perform due to your medical condition?":

> I am unable to continue Obstetrics. I can not lift >2 lbs. My grip strength
> is poor. I drop a lot. I have very limited range of motion in my wrist.
> Around 20° extension/flexion/ My L wrist is 85-95°. I can not supinate my
> arm enough to deliver a baby's head, especially by c-section. I am not sure
> If I can safely perform gyn surgery. I have difficulty writing, typing and driving.

(Id. at ¶ 43; ECF No. 31-14). On July 19, 2018, Dr. Hood responded to a list of three questions posed by a disability specialist regarding Plaintiff's ability to perform certain procedures, indicating that Plaintiff would not be able to perform a pelvic exam while wearing a brace, and that it was doubtful that, without a brace, Plaintiff had the dexterity and manual flexibility in her hands and fingers to place a speculum or to perform a pelvic exam, an endometrial biopsy, or a cervical biopsy. (Id. at ¶ 44; ECF No. 31-15). Dr. Hood later clarified his response on July 24, 2018, by stating that Plaintiff could perform the tasks listed in his previous response with her left

5

hand. (Id. at ¶ 45; ECF No. 31-16). The skills required to be performed by an outpatient only OB/GYN physician, and specifically a pelvic exam, are "bimanual" procedures, meaning that both hands are required. (Id. at ¶ 47). Given Dr Hood's indication that Plaintiff could only perform the specific gynecological procedures referenced in his July 24, 2018 response with her left hand, UPMC remained concerned that returning Plaintiff to her position would endanger patient safety. (Id. at ¶ 48).

On October 16, 2018, Wendy Kalocay ("Kalocay"), Assistant Administrator at UPMC Women's Health, sent Plaintiff an email indicating that "Magee's Outpatient Clinic" had arranged for her to proctor "under her colleagues" in its resident clinic "to confirm that [she was] able to competently perform gyn procedures using [her] left hand as [her] dominant hand to ensure patient safety." (Id. at ¶ 49; ECF No. 31-17). On October 22, 2018, Plaintiff's attorney responded to Kalocay's email stating, in part, that Plaintiff would "not be reporting to the clinic" because she was "not interested in a process that [would] further delay her moving on from this matter and moving forward with her life," and that she did "not believe that working in the Magee clinic [was] in her best interest at [that] time …." (ECF No. 31-18).

On January 18, 2019, UPMC sent Plaintiff a letter notifying her that she was deemed to have violated the terms of her Employment Agreement and that she had thirty (30) days to cure the violations or "UPP may immediately terminate [her] employment." (Id. at ¶ 53; ECF No. 31-19). Subsequently, on May 10, 2019, UPMC terminated Plaintiff's Employment Agreement pursuant to Section 8.6.1 of the Agreement, which states, in pertinent part:

> UPP may, in its sole discretion and consistent with UPMC disability accommodation policy, decide to terminate the Agreement by giving written notice to Physician, if in the event of the Physician's disability, whether physical or psychological or otherwise, which is of such a nature that Physician is unable to perform the essential functions of his/her employment. The decision to end the Agreement in these circumstances

> will be in UPP's reasonable and good faith judgment, taking into account whether Physician is eligible for leave under UPMC policy and, in such case, whether Physician has exhausted family medical leave, so calculated pursuant to UPP policy, during any rolling twelve-month period, and the essential functions of Physician's job will include his/her duties as described in this Agreement, with or without reasonable accommodation....

(Id. at ¶ 54; ECF No. 31-20). Plaintiff later began working for LECOM in 2020. (Id. at ¶ 56).

## II. DISCUSSION

### A. Breach of Employment Contract

Count I of the complaint alleges that UPMC committed multiple breaches of its Employment Agreement with Plaintiff, culminating with the termination of Plaintiff's employment on May 10, 2019, including:

> 1. Failure to pay the base salary required Section 1.4 of the Employment Agreement, including failure to give 90-day notice of reduction of salary;
>
> 2. Failure to pay incentive salary as required by Section 4.4 of the Employment Agreement;
>
> 3. Failure to pay fringe benefits as required by Section 4.4 of the Employment Agreement;
>
> 4. Failure to engage in the interactive process[4] after Plaintiff made known the existence of her disability, in direct violation of Section 8.6.1 of the Employment Agreement; and
>
> 5. Failure to take steps required under Section 8.6.1 of the Employment Agreement including suspension with pay if the employer believes the safety of patients are involved.

(ECF No. 1-1, at ¶ 40).

---

[4] The "interactive process" mandated by the ADA is incorporated by reference in Section 8.6.1 of the Employment Agreement [ECF No. 31-20]

Nonetheless, Defendants' motion for summary judgment focuses solely on UPMC's actions with regard to the interactive process, asserting that "whether UPMC complied with the ADA's interactive process is the key legal question related to Count I of Plaintiff's complaint." (ECF No. 33, at p. 7). In so doing, Defendants fail to address the other breaches alleged by Plaintiff in her complaint.[5] Furthermore, as Plaintiff notes in her opposition brief, many of the facts enumerated in Defendants' brief in support of their motion are mischaracterized as "undisputed," when, in fact, they are partly or wholly disputed by Plaintiff (ECF No. 33, at pp. 6-7; ECF No. 39, at pp 13-15).

Notably, for instance, Defendants state as undisputed fact that "[a]t no time after her January 2018 surgery was Plaintiff ever released to return to work to perform **any** obstetric procedures" (Id. at p. 6, ¶ 3)(emphasis added); however, this blanket statement is not supported by the cited paragraphs of Defendants' concise statement of material facts (ECF No. 32 at ¶¶ 34-43), nor is it undisputed, as noted in Plaintiff's responses to those same paragraphs (ECF No. 50, at ¶¶ 34-43). Indeed, the record indicates that Plaintiff was capable of performing some obstetric procedures with her left hand only. (Id. at ¶¶ 45-48). In addition, the facts cited by Defendants regarding the "proctoring exercise" that was proposed to Plaintiff are all disputed by Plaintiff and are not definitively established by the record. (ECF No. 33, at pp. 6-7, ¶¶ 6-8). Finally, Defendants' statement that it did not have "an open position for an in-office gynecology only

---

[5] Defendants do include a single paragraph in their reply brief disputing Plaintiff's claim that she was not paid full compensation while she remained on leave (ECF No. 43, at p. 4); however, this paragraph, standing alone, is woefully insufficient to support the entry of summary judgment on Count I of the complaint, which includes specific allegations of failure to give 90-day notice of reduction in pay, failure to pay incentive salary, and failure to provide fringe benefits, among other things. (ECF No. 1-1 at ¶ 40).

physician" after Plaintiff commenced her leave (Id. at p. 7, ¶ 9) is "completely disputed" by Plaintiff (ECF No. 50, at ¶ 36).

In short, there remain genuine issues of material fact with regard to Plaintiff's claim of breach of Employment Agreement that preclude the entry of summary judgment.

### B.     Misappropriation of Name and Likeness

Count II of the complaint alleges that UPMC misappropriated Plaintiff's name and likeness by keeping her name and picture on the UPMC website after she was terminated, distributing brochures and other information that continued to have her name on it, and incorrectly informing or misleading patients that UPMC continued to employ Plaintiff and that she would be returning to UPMC, when it knew otherwise.

"The Pennsylvania Supreme Court has expressly recognized a cause of action for "invasion of privacy" by "appropriation of name or likeness." Lewis v. Marriott Int'l, Inc., 527 F. Supp. 2d 422, 429 (E.D. Pa. 2007), citing Vogel v. W.T. Grant Co., 327 A.2d 133 (Pa. 1974). To be liable for appropriation, a "defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness.... Until the value of the name has in some way been appropriated, there is no tort." AFL Philadelphia LLC v. Krause, 639 F.Supp.2d 512, 530 (E.D. Pa. 2009) (citation omitted).

Under Pennsylvania law, a claim of invasion of privacy by appropriation of name or likeness is subject to a one-year statute of limitations. Burger v. Blair Medical Ass0c., Inc., 964 A.2d 374, 376 (Pa. 2009); 42 Pa. C.S.A. § 5523(1). However, the statute "does not begin to run until such time as the Plaintiff has discovered [her] injury, or in the exercise of reasonable diligence, should have discovery of the injury." Doe v. Kohn Nast and Graf, 866 F.Supp. 190,

195 (E.D. Pa. 1994) (citation omitted). "Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it." Fine v Checcio, 870 A.2d 850, 858 (Pa. 2005) (citations omitted). "Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law. Id. at 858-59, citing Pocono International Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983).

Defendants have moved for the entry of summary judgment on this claim, arguing that "Plaintiff has failed to establish that an appropriation of her name and likeness occurred within the applicable limitations period" (ECF No. 33, at pp. 14-15), and is unable to cite any record evidence to support her claim in any event (ECF No. 43, at p. 5). The Court agrees.

Plaintiff originally filed her complaint in the Court of Common Pleas of Erie County, Pennsylvania on February 8, 2022, before this case was removed to this Court on March 15, 2022. Thus, in order for Plaintiff's misappropriation claim to be timely, Plaintiff would have to prove that she could not have been aware of the facts underlying such claim until sometime after February 8, 2021. This she cannot do.

In her opposition brief, Plaintiff asserts,

> over the next year after late-June 2020, hundreds of her former patients came to see her at LECOM and told her they had no idea she had left Erie Magee, that no one from UPMC had told them that she was no longer at Erie Magee and they had received no written communication on this issue. *It was only during these discussions with her patients that [Plaintiff] first discovered that UPMC was continuing to use her name in advertising materials and continued to tell patients, or at least create the impression with patients, that [Plaintiff] continued to work there.*

(ECF No. 39, at p. 32) (emphasis added). According to this argument, the majority of Plaintiff's discussions with her former patients would have likely occurred prior to February 8, 2021.

Indeed, Plaintiff acknowledged during her deposition that at least one such discussion took place with a former patient, Valerie Smith, at the end of June 2020, and that she saw another former patient, Stacy Huff, in July 2020. (ECF No. 31-5, at p. 92-94). These patient visits alone indicate that Plaintiff was able to discover the facts underlying her misappropriation claim, through the exercise of reasonable diligence, well before February 8, 2021. Thus, the Court is able to conclude that Plaintiff's misappropriation claim is untimely as a matter of law.

Nonetheless, even assuming *arguendo* that such claim was timely filed, the record evidence is woefully insufficient to support Plaintiff's claim. As Defendants note, none of the former patients who testified on Plaintiff's behalf were able to recall whether they were told by UPMC that Plaintiff was on leave and/or still employed by UPMC at any time after May 2019 (See, e.g., ECF No. 31-22, Katy Goring's deposition transcript, at p. 16; ECF No. 31-23, Michelle Pierce's deposition transcript, at p. 15; ECF No. 31-24, Brenda Moski's deposition transcript, at pp. 9-10, 13-17, 22; ECF No. 31-25, Jennifer Gilroy's deposition transcript, at p. 19; ECF No. 51-6, Phoebe Clemente's deposition transcript, at p. 4). Moreover, the record evidence includes a copy of UPMC's physician directory as of May 2019, which reveals that Plaintiff's name and information were crossed out in red after she was terminated.

Based on the foregoing, therefore, summary judgment will be entered in favor of Defendants and against Plaintiff on the misappropriation claim at Count II of Plaintiff's complaint.

### C.   Tortious Interference Claim

Count III of the complaint claims that UPMC tortiously interfered with Plaintiff's existing and prospective relationships with clients. In particular, Plaintiff alleges that she "brought [to UPMC] a sizeable client roster" that UPMC absorbed into its Erie Magee practice

and then intentionally interfered with Plaintiff's ability to maintain her relationship with those clients both at Erie Magee and elsewhere.

To establish a claim of tortious interference with contractual or prospective contractual relations, Plaintiff must adduce evidence to prove

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of legal damage as a result of the defendant's conduct.

Cent. Pennsylvania Radiation Oncology, P.C. v. Good Samaritan Hosp. of Lebanon, Pennsylvania, 271 A.3d 539 (Table), 2021 WL 5919482, at *11 (Pa. Cmwlth. 2014), citing Orange Stones Co. v. City of Reading, 87 A.3d 1014, 1025 (Pa. Cmwlth. 2014) (citing Pelagatti v. Cohen, 536 A.2d 1237, 1343 (Pa. Super. 1971)). "It is important to note that interference is an intentional tort, meaning the actor is acting as he does for the purpose of causing harm to the Plaintiff. 'The wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract.'" Cent. Pennsylvania Radiation Oncology, P.C., at *11, quoting Glenn v. Point Park College, 272 A.2d 895, 899 (Pa. 1971).

Here, Defendants assert that Plaintiff "cannot produce evidence of 'prospective or existing contractual relationships' between herself, individually, and patients, nor can she demonstrate the requisite intentionality on the part of UPMC." (ECF N. 33, at p. 16). As to the first point, Defendants note that the Employment Agreement specifically states that "[a]ll patients for whom [Plaintiff] provides medical care are the patients of UPP with respect to all other matters." (Id.; ECF No. 31-7 at p. 5, Section 6.0). Thus, Defendants' argue that "the prospective or existing contractual relationships with patients were with UPMC," not with Plaintiff. (Id.). However, while the provision cited by Defendants appears to support their

argument that UPMC had an *existing* contractual relationship with the patients for whom Plaintiff provided medical care at Erie Magee, it in no way prevents Plaintiff from establishing that her *prospective* contractual relationships with those patients were interfered with by UPMC after she was terminated from the Erie Magee practice (once her one-year restrictive covenant expired), which is, indeed, the basis of Plaintiff's claim.

Secondarily, Defendants argue that Plaintiff is unable to meet the intentionality element of her claim because "Section 8.6.1 of the Employment Agreement expressly authorized UPMC's decision to terminate Plaintiff" and, "[t]hus, Plaintiff cannot show any unjustified act by UPMS that harmed her." (ECF No. 33, a p. 17). However, this argument also misses the mark. Plaintiff's claim is not based solely on UPMC's ultimate decision to terminate her employment, but also relates to UPMC's actions after her termination that, she claims, alienated her from her patients. These actions, if proven, would be sufficient to establish "purposeful action on the part of [Defendants], specifically intended … to prevent a prospective relation from occurring" between Plaintiff and her former patients, without justification. At the very least, there remains a genuine issue of material fact as to whether such actions occurred.

For the foregoing reasons, therefore, Defendants' motion for summary judgment on Plaintiffs tortious interference claim will be denied.

### D.   Misrepresentation Claim

Count IV of Plaintiff's complaint claims that UPMC induced her to enter into the Employment Agreement by making verbal misrepresentations regarding the support her OB/GYN practice would receive from UPMC over the term of the contract. In particular, she claims that promises were made regarding patient scheduling, recruitment of staff from her previous employer, same-day diagnostic testing, and other issues that were not fulfilled during

13

the period of time she was actively working for UPMC. Defendants argue that this claim fails as a matter of law because it is barred by both the applicable statute of limitations and the parol evidence rule.

Under Pennsylvania law, the applicable statute of limitations for the tort of misrepresentation is two years. Toy v. Metro. Life Ins. Co., 863 A.2d 1, 7 (Pa. Super. 2004), aff'd 928 A.2d 186 (Pa. 2007), citing 42 Pa. C.S.A. § 5524(7). Thus, based on the date this action was filed, February 8, 2022, Plaintiff would have to prove that she could not have been aware of the facts underlying her misrepresentation claim until sometime after February 8, 2020. This she cannot do.

It is undisputed that Plaintiff signed the Employment Agreement in February 2017 and began her employment with UPMC on May 1, 2017. Plaintiff's complaint alleges that "shortly after the contract was signed a decision was made to move in a different direction" and "the decision to 'fold' the OB/GYN practice that the Plaintiff had been induced to enter into was known by Defendants at the time the employment contract was entered." (ECF No. 1-1, at ¶¶ 60, 63). Then in support of this claim, Plaintiff testified that UPMC made a number promises that they did not honor during the period of time she was working (between May 2017 and her leave in January 2018). (ECF No. 31-5, at pp. 29-31; ECF No. 32, at ¶ 9). All of these things occurred more than four years before Plaintiff filed the present action.

Nonetheless, Plaintiff argues that "[t]he promises only became misrepresentations when over the course of the employment agreement none of the promises were met and, therefore, the earliest date that the promises could have turned into misrepresentations was the termination date of May 10, 2019." (ECF No. 39, at p. 45). However, this date is also beyond the reach of the two- year statute of limitations. Apparently recognizing this, Plaintiff then makes the assertion

14

that "[a]rguably, it is not entirely clear when the promises turned into misrepresentations," and, thus, the actual date on which Plaintiff discovered the misrepresentations is a question of fact for a jury to decide. (Id. at pp. 45-46). This thinly veiled attempt to artificially extend the discovery date is unavailing, as it plainly contradicts Plaintiff's own allegations and deposition testimony of record. Based upon this record, it is clear that Plaintiff knew, or through the exercise of reasonable diligence should have known, that the alleged misrepresentations occurred, prior to February 8, 2020. Accordingly, Plaintiff's misrepresentation claim is barred by the statute of limitations and summary judgment will be entered in favor of Defendants on such claim.

    An appropriate Order follows.